(C. D. 1107)

OLAVARRIA & CO., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 14, 1948)

*William Whynman* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh* and *Richard F. Weeks*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

EKWALL, Judge: Three protests are involved herein. They all relate to the same importation of sugar imported from Cuba and entered for warehouse at the port of Mobile, Ala. The protests make claims as follows:

Protest 13272–K claims that before 12:54 p. m., eastern standard time, September 12, 1939, there were tendered to the collector a consumption entry and warehouse withdrawal and permit for delivery covering the merchandise here involved, .together with all duties, taxes, and other charges due and payable, which entry was refused by the collector. Further, it is claimed that any increased or different rates over and above those in effect on or before September 11, 1939, at 11 p. m., eastern standard time, which were demanded, were illegal and contrary to law.

Protest 18643–K claims that the law levying the tax on sugar was unlawful and that the legal rate of duty prevailing was the rate effective on September 11, 1939, before 11 p. m., eastern standard time, and demands refund of all excess duty and taxes above the legal duty and taxes.

Protest 25765–K claims that the compensation tax is illegal and that the merchandise was dutiable pursuant to the rate provided by the Cuban Trade Agreement in effect on September 11, 1939, before 11 p. m., eastern standard time.

At the trial of the issue at the port of entry plaintiff's counsel stated the issue as follows:

Now, we want to prove that on September 12, 1939, before 11:54 Central Time, we had presented an entry in due form, or withdrawal, with a certified check to the Collector of Customs for the duty at the rate in effect, that is, the old rate of September 11, 1939. We shall prove that the Collector of Customs notified the representative, our client, our customs broker that the duty was decreased and not increased and consequently, he said, "I can't accept your check. Take your

check back and bring me a check for a lower rate, because it is a rule of the Collector that we cannot give change."

The duty on sugar of the kind here involved was fixed by paragraph 501 of the Tariff Act of 1930, which imposed a rate of 1.7125 cents per pound on sugar testing by the polariscope above fifty sugar degrees and not above seventy-five sugar degrees, and an additional duty of three hundred and seventy-five ten-thousandths of 1 cent per pound for each additional sugar degree. From this rate, Cuban sugar was entitled to a reduction of 20 per centum under the terms of the treaty of commercial reciprocity between the United States and the Republic of Cuba, approved December 17, 1903. 33 Stat. 3 (19 U. S. C. secs. 124 and 125). (Section 316, Tariff Act of 1930.)

Under authority of section 336 of the Tariff Act of 1930, the flexible tariff provision, the rates of duty provided in said paragraph 501 were reduced on sugar "testing by the polariscope above fifty sugar degrees and not above seventy-five sugar degrees, from 1.7125 cents per pound to 1.284375 cents per pound" and from "three hundred and seventy-five ten-thousandths of 1 cent per pound" to "two hundred and eighty-one and one-fourth ten-thousandths of 1 cent per pound additional" for "each additional sugar degree shown by the polariscopic test" and "fractions of a degree in proportion." (Presidential proclamation, T. D. 47040.) There is no dispute in the instant case as to the polariscopic test or nature of the sugar here involved.

Subsequent to the date of the Presidential proclamation reducing the rate on sugar, a reciprocal trade agreement was entered into between the United States and the Republic of Cuba, effective September 3, 1934, wherein the rates of duty on sugar were again reduced. (T. D. 47232.) By a public notice given by the Secretary of Agriculture pursuant to a Presidential proclamation, issued in accordance with the provisions of the Sugar Act of 1937 (50 Stat. 903) and the provisions of the trade agreement, the rates of duty on sugar provided in the trade agreement were suspended, and the higher rates provided in the Presidential proclamation (T. D. 47040, *supra*), again became effective at 12:54 p. m., eastern standard time, September 12, 1939. (T. D. 49977.) The effective date of the change in rates was originally given by telegram dated September 11, 1939, at 11 p. m., eastern standard time, September 11, 1939. (T. D. 49962.)

It is agreed in the instant case that at the end of the day on September 11, 1939, 20,000 bags of sugar remained in warehouse. It is conceded that withdrawal papers, together with a check in payment of duties, were tendered to the office of the collector of customs prior to 11:54 a. m., central time, on September 12, 1939.

From the record the following appears. On September 12, 1939, at which time the entry clerk at the Mobile customhouse had received and read the Bureau telegram of September 11, 1939, fixing

the time of the change in rate as on and after 11 p. m., eastern standard time, September 11, 1939, the customs brokers of the importer herein sent a messenger to the customhouse with a warehouse withdrawal for the 20,000 bags of sugar here involved, together with a cashier's check of the Merchants National Bank of Mobile for $29,780. The collector's office had on file a power of attorney from Olavarria & Co., Inc., the importer of this sugar, to Page & Jones, the customs brokers. Mr. Holmes, at that time the entry clerk at the customhouse, testified that he told the messenger Krauss that it looked as·if the duty was going to be reduced, since he interpreted the first·telegram as calling for a lower rate. The check represented the amount of duty on Cuban sugar of this type in effect before the receipt of the telegram, i. e., 0.954 cent per pound and the compensating tax of 0.535 cent per pound. Mr. Jones of the brokerage firm testified that the messenger brought this check back and said the customs would not accept it. Mr. Holmes testified that he told the messenger that it looked as if the duty was going to be reduced. He did not tell him to procure a new check at the new rate of duty, nor did he figure out the amount of duty which he [Holmes] considered the proper amount in view of the telegram. He stated that the entry presented by the messenger .was accepted as he presented it. Mr. Jones testified that upon the return of the messenger, he contacted Mr. Holmes and was told that the rate of duty had been lowered by a telegram received that morning.

Withdrawal procedure was explained by Mr. Holmes as follows: The entry or withdrawal is presented to the entry clerk who checks the rates, figures the amount of duty, and issues withdrawal, which is then taken to the cashier who collects the amount due and numbers the withdrawal, stamping the entry paid. This procedure was followed in the case of the first presentation.

Mr. Jones testified that he arrived at the correct amount of duty; that he took a second check for a lesser amount [$25,964] to the collector's office and tendered it with the papers to Mr. Holmes; that he talked to Mr. Holmes and was told the rate of duty had been lowered and therefore the first withdrawal had been returned and it was necessary to file one for a lower rate. Later on the same day, at about 1:25 p. m., the customs brokers received a telegram from the importer and Mr. Jones spoke to Mr. Holmes telling him they had a request from the importer to cancel the withdrawal on which the $25,964 check had been tendered. Mr. Holmes referred him to Mr. Dodd, the assistant collector. He [Jones] spoke to Mr. Dodd on the telephone and was told the second check had gone through and the withdrawal could not be canceled. At that time Mr. Jones did not receive the check for $25,964 back from the assistant collector.

Mr. Holmes testified that he did not talk with Mr. Jones; that the messenger [Krauss] came back after 1 p. m., Mobile time, and requested a withdrawal and asked that the withdrawal entry be given back to him because the importer was going to withdraw a smaller amount. Mr. Holmes stated he told the messenger that he would ask the cashier, and if the withdrawal had not actually been accounted for by the cashier, it would be given back. He did not return the check at that particular moment. He stated positively that he did not subsequently talk to Mr. Jones. After consulting the assistant collector, Mr. Dodd, and obtaining his consent, he gave the entries back to the messenger, Krauss, probably about 30 or 40 minutes later. To the best of his recollection the messenger asked to have the entry returned to him. This witness knew nothing about the presentation of the second withdrawal at the customhouse.

Mr. Dodd, the assistant collector, testified that a representative of the Merchants National Bank came over to the customhouse and explained that his bank had instructions to withdraw the entries. After an investigation which showed that no record of any entries had been made as yet, Mr. Dodd said, "Well, we can cancel the whole business." This was done because the second check was never negotiated and the withdrawal never went through the collector's books.

The check clerk of the Merchants National Bank testified as to the issuance of the checks (which were both cashier's checks), also as to the instructions received from the Commercial National Bank & Trust Co. of New York, and he established that neither check was cashed and neither bore any marks showing that either one was received by the collector. The checks were returned to the bank's foreign department.

The record discloses that this sugar was subsequently withdrawn and the entry liquidated at the rate of 1.59 cents per pound plus 0.535 cent per pound as compensating tax.

On this record has plaintiff sustained its burden of proof?

The testimony is conflicting as to what happened at the time the messenger called at the customhouse. The messenger was not produced, although plaintiff's counsel requested and was granted a continuance for the purpose of producing him as a witness and also producing the manager of the foreign department of the bank. The case was submitted almost a year after the hearing without further testimony.

In view of the conflicting testimony as to the reason for the withdrawal of the check first presented and in the absence of testimony on the part of the messenger who presented the check as to what took place at the customhouse, we find that plaintiff has failed to sustain its burden of proof on the question of whether the customs authorities

refused to accept the first check. This check (exhibit 1) was returned to the customs brokers by the messenger.

As to the second check (exhibit 2) it appears that this was withdrawn at the request of the importer who had decided to withdraw a smaller amount of its goods from warehouse. Neither check was cashed nor negotiated.

It is plaintiff's contention as set forth in the brief filed that the customs brokers prepared all the necessary papers and documents and tendered to the customs good cashier's checks in the amounts estimated and demanded by the customs, prior to 11:54 a. m., central standard time, on September 12, 1939. Plaintiff further contends that under section 512 of the Tariff Act of 1930 it was the duty of the collector to immediately deposit moneys for the payment of duties to the credit of the Treasurer of the United States and that the return of the moneys by the collector is tantamount to a conversion. Said section 512 reads as follows:

SEC. 512. DEPOSIT OF DUTY RECEIPTS.

All moneys paid to any collector for unascertained duties or for duties paid under protest against the rate or amount of duties charged shall be deposited to the credit of the Treasurer of the United States and shall not be held by the collectors to await any ascertainment of duties or the result of any litigation in relation to the rate or amount of duties legally chargeable and collectible in any case where money is so paid.

To say that the collector must "immediately" deposit moneys collected as customs duties to the credit of the Treasurer of the United States, is to ignore the practicalities of the situation. In the Customs Manual (1943 edition), sections 24.2–24.6 consist of regulations by the Secretary of the Treasury for collection and accounting of customs receipts. Section 24.5 provides:

Deposit of collections; in general.—(a) The gross amount of all moneys received from any source for the use of the United States shall be deposited daily in a designated Government depositary. * * *

There is no intimation either in the statute or the regulations thereunder that *immediately* upon receipt of such moneys deposit must be made of the same. In fact, to require that every sum received be immediately deposited in a bank would be contrary to all business custom. In the instant case the assistant collector testified that as no record had been made of the entry at the time the request for the return of the second check was made, he returned both the check and the withdrawal in accordance with the importer's request. The reason given in the record for such request was, as stated above, that the importer had decided it wished to withdraw a smaller amount than that represented on the withdrawal, i. e., 20,000 bags.

Upon the record we find that the plaintiff has failed to support its claims. The protests are therefore overruled.

Judgment will be rendered for the defendant.